Housing Mortgage Corporation, Appellant, *v.* Allied Construction, Inc.

Argued March 25, 1953. Before STERN, C. J., STEARNE, JONES, CHIDSEY, MUSMANNO and ARNOLD, JJ. Appeals, Nos. 4, 5, 16 and 17,

*Myron E. Rowley,* with him *Ralph E. Smith, James E. Rowley* and *Rowley & Smith,* for purchase money mortgagee.

*W. Denning Stewart,* with him *Harold L. Roth* and *Ira Hurwick,* for Housing Mortgage Corporation.

OPINION BY MR. CHIEF JUSTICE HORACE STERN, June 26, 1953:

The sole question involved in this litigation concerns the relative priority of the liens of a purchase money mortgage and a "construction" or advance-money mortgage.

James B. Clark was the owner of a tract of land in Beaver County in which he had laid out a plan of lots. On March 15, 1947, he and his wife agreed to sell 34 of these lots to Allied Communities, Inc., for the sum of $23,800, which was to be paid by the execution of a purchase money mortgage in that amount, payable in one year thereafter, with 5% interest thereon, and with the express understanding and agreement that the purchaser would proceed forthwith to erect dwelling houses on the lots, with the privilege for that purpose of placing construction loans on the property, the liens of which by proper stipulation should be made prior to the lien of the purchase money mortgage when the construction mortgages were recorded and the erection of the dwelling houses commenced. This agreement was subsequently assigned by Allied Communities, Inc. to Allied Construction Co., Inc., an affiliated corporation engaged in the erection of dwellings.

A month later, on April 21, 1947, Clark, officers of Allied Construction Company (hereinafter called Allied) and officers of Housing Mortgage Corporation (hereinafter called Housing) which was a corporation engaged in the business of making mortgage loans, met in the offices of Housing, and at that meeting there were simultaneously executed a deed from Clark and his wife to Allied, a purchase money mortgage from Allied to Clark, certain construction loan agreements between Allied and Housing, and three construction loan mortgages from Allied to Housing. The deed and all the mortgages were promptly thereafter recorded.

The purchase money mortgage from Allied to Clark contained a provision that "the lien of this mortgage . . . is hereby postponed and made junior in lien to three certain mortgages of even date herewith and to be recorded, given by the mortgagor herein to Housing Mortgage Corporation, which three mortgages are in the sums of $102,200, $102,200 and $43,800, or a total of $248,200; it being understood that the said three mortgages shall be first liens on each of the several lots described in said mortgages."

Each of the three construction loan mortgages from Allied to Housing contained a provision that "The several sums of money aggregating the full amount of the debt secured by this mortgage are to be advanced by the mortgagee to the mortgagor in accordance with the terms and requirements of a certain agreement of even date herewith between the parties hereto . . . ."

Each of the three construction loan agreements thus referred to provided for a schedule of the amounts which were to be advanced by Housing to Allied at various stages in the erection of the dwellings, as follows:—(a) no immediate payment; (b) a certain specified sum when the foundation of each house was completed and the first floor joists were in place; (c) a certain specified sum when the shell of each house was erected and the roof installed; (d) a certain specified sum when the brick or stone veneer front and all siding had been applied to each house, chimneys erected, door and window frames set, prime coated; (e) a certain specified sum when the plumbing of each house had been installed, wiring roughed in; furnace roughed in; (f) a certain specified sum when each house had the plaster completed; basement floor in; windows and exterior doors hung; (g) a certain specified sum when each house had been trimmed, the doors in; floors completed, hardware in; painting completed; ready for final FHA inspection. It was pro-

vided that these payments were to be made only if and when the various stages of work were completed to the satisfaction of the mortgagee.

From time to time as the work progressed Housing advanced money to Allied but apparently, in the case of the 14 lots involved in the present proceedings, it made some payments to Allied before they were due according to the schedule contained in the construction loan agreements. Allied having become financially involved at a time when the houses were still uncompleted, Housing instituted foreclosure proceedings on two of its mortgages, entered judgments on the bonds, issued executions, and at the sheriff's sales bought in 13 of the lots under one sale for the sum of $67,000, and one lot under the other sale for the sum of $8,007.52; on the one sale it paid in cash $1,532 for costs and taxes and obtained from the sheriff a receipt for the balance; on the other sale it paid in cash $410.77 for costs and taxes and obtained from the sheriff a receipt for the balance. The sheriff filed proposed statements of distribution which granted priority to the claim of Housing to the extent of *all* its payments under its advance money mortgages over the claim of Clark on his purchase money mortgage. Clark filed exceptions, claiming priority for the amount still due on his mortgage* over the claim of Housing for any advance payments in excess of those stipulated in the schedule set forth in the construction loan agreements./ Upon petition of Housing the court made an order permitting the sheriff to deliver to it deeds for the 14 lots upon its paying to the prothonotary the sums of $9,658.00 and $742.00, or a total of $10,-400.00, which was to be held pending the final order of the court. The court appointed an auditor who filed a

---

* Clark had received payments in respect to 19 other lots and houses not here involved, thereby reducing his claim in these proceedings, according to agreement of counsel, to $10,400.

report recommending that Clark's exceptions be dismissed. The court below sustained the auditor's report, whereupon appeals were taken to this court. We held (*Housing Mortgage Corporation v. Allied Construction Company, Inc.*, 367 Pa. 351, 80 A. 2d 748) that the record was not such as to enable us to determine the controlling question, and accordingly we remanded the record to the court below to ascertain to what extent Housing had made payments in excess of those provided for in the schedule. The auditor took additional testimony and filed a supplemental report taking the same view as before. Clark having meanwhile died, the executors of his estate filed exceptions to the supplemental report; those exceptions being overruled by the court the executors took two of the present appeals. The court imposed the costs upon Housing, from which action Housing has filed the two other appeals now before us.

It is the contention of the Clark Estate (1) that their decedent, the purchase money mortgagee, had the right to insist upon Housing complying with the schedule of advance payments contained in the construction loan agreements between it and Allied; (2) that any payments made by Housing to Allied which did not so comply were voluntary, not obligatory, on its part; and (3) that the lien of Clark's purchase money mortgage was therefore subordinated to that of the advance-money mortgages of Housing only to the extent that the advances made by the latter were as prescribed in the schedule. Since it is our opinion that these contentions are valid, the orders of the court below based on contrary conclusions must be reversed.

When Clark agreed that Allied should have the right to place construction loans on the property, the liens of which by proper stipulation should be made prior to the lien of his purchase money mortgage, he obviously

meant by the term "construction loans" what is ordinarily understood thereby, namely, loans to be advanced as the building operations progressed. And when, in the deed for the property, he agreed that the lien of his mortgage should be postponed to that of "three certain mortgages of even date herewith and to be recorded, given by the mortgagor herein to Housing Mortgage Corporation," it is equally obvious that the postponement thus effected was to be to the three specific or "certain" mortgages then and there executed and recorded simultaneously with his own mortgage, part of the terms of which were that the loans by Housing were to be advanced in accordance with the terms and requirements of the accompanying construction loan agreements between Housing and Allied thus expressly referred to and thereby incorporated in those mortgages. In other words, Clark was not subordinating the lien of his mortgage to *any* three mortgages aggregating $248,200, but to the three mortgages expressly specified, and therefore as expressly conditioned by the terms and conditions of the construction loan agreements under which the loans were to be made. It would be wholly incredible to suppose that Clark, taking back a purchase money mortgage for the full price of the property he was selling, $23,800, could have intended to subordinate the lien of his mortgage to those of other tremendously larger mortgages which would immediately have made his own mortgage wholly worthless, if, as the court below in effect held, such other liens would have been paramount to his even though Housing should have chosen to pay over to Allied at once the entire $248,200 of their proposed loans. On the contrary, the only reason for his subordination of his lien was, of course, that if the payments were advanced by Housing only as agreed upon, the Housing liens ahead of his own would increase in amount only as the mortgaged property

simultaneously increased in value because of the concomitant progress in the work of construction. The evidence shows that Clark, Allied and Housing were in perfect understanding and agreement as to the entire transaction and as to the rights of each and all of them in connection therewith, and the interrelation of the deed and all the mortgages involved clearly appears from the documents themselves. Those documents, therefore, must be interpreted together, since, even though not made by the same parties, they were part and parcel of the same transaction: Restatement, Contracts, §235(c); 3 Williston on Contracts, (rev. ed.) p. 1803, §628.

"In many cases . . . the terms of agreement may be expressed in two or more separate documents, some of them containing promises and statements as to their agreed consideration, and others, such as deeds, mortgages and trust indentures, being performances agreed on rather than a statement of terms to be performed. In every such case, these documents should be interpreted together, each one assisting in determining the meaning intended to be expressed by the others. *This is true whether the documents are all executed by a single party or by two or more parties, and whether some of the documents are executed by parties who have no part in executing the others. A transaction may be tri-partite or even more complex, a factor that must not be disregarded in the process of interpretation of any of the documents.*" 3 Corbin on Contracts, pp. 102, 103, §549.

"A contract may be contained in several instruments. These if made at the same time, in relation to the same subject-matter, may be read together as one instrument, and the recitals in one may be explained or limited by reference to the other. *This rule obtains even when the parties are not the same; if the several contracts were*

*known to all the parties and were delivered at the same time to accomplish an agreed purpose."* Peterson v. Miller Rubber Co. of New York, 24 F. 2d 59, 62.

"In this case the parties intended to settle no more than one comprehensive business deal, and the District Court correctly found that the four contracts under discussion constituted a single transaction—the granting of a license under the Hopkins patent, and a mutual adjustment of rights occasioned by the granting of that license. This is evidenced, for instance, by the references within the contracts to others of the four, by the manifest interrelationships of the specific subject matters, and, incidentally, by the fact that the contracts were all entered into at one time." *Patterson-Ballagh Corporation v. Byron Jackson Co.,* 145 F. 2d 786, 788, 789.

"The Pennsylvania cases indicate that even where there is no specific reference to a prior agreement or prior agreements, several contracts shall be interpreted as a whole and together." *Chicago Pneumatic Tool Co. v. Ziegler,* 151 F. 2d 784, 795.

Since, then, Clark was entitled to the protection afforded by the terms of the construction loan agreements regarding the timing of the advances, the lien of his purchase money mortgage was deferred in priority to the Housing liens only to the extent of the advances made by Housing in accordance with the provisions of the schedule contained in those agreements. The law is definitely established that an advance made pursuant to a mortgage to secure future advances which the mortgagee was not *obligated* to make, is subordinate in lien to an encumbrance intervening between the giving of the mortgage and the making of the advance, if the advance was made with actual notice or knowledge of the intervening encumbrance; the lien of an advance under such circumstances dates only from the time it was made and not from the time of the creation of the mortgage.

In other words, after notice of the existence of a junior lien, the senior mortgagee will not be protected in making further advances under his mortgage unless he is under *a binding obligation* to make such advances: *Ter-Hoven v. Kerns,* 2 Pa. 96; *The Bank of Montgomery County's Appeal,* 36 Pa. 170, *Taylor v. Cornelius,* 60 Pa. 187; *Moats v. Thompson,* 283 Pa. 313, 319, 320, 129 A. 105, 107; *Batten v. Jurist,* 306 Pa. 64, 73, 158 A. 557, 560; *Wardman v. Iseman,* 99 Pa. Superior Ct. 551, 554. It is only when the advance-money mortgagee is contractually obligated to make the advances that their lien relates aback to the date of the mortgage: *Moroney's Appeal,* 24 Pa. 372; *Taylor v. Cornelius,* 60 Pa. 187, 196; *Land Title & Trust Co. v. Shoemaker,* 257 Pa. 213, 219, 101 A. 335, 337.

The court below reached the mistaken conclusion that the making of Housing's advances under its mortgages was not voluntary on its part but obligatory. That of course is true as far as the advances were made in compliance with the schedule contained in the construction loan agreements, but the payments in excess of those required by those agreements at each successive stage of the work of construction were clearly voluntary since Allied could not legally have compelled Housing to make them.

This, then, brings us to the final question in the case— a factual one—namely: Were any such excess payments made and to what extent? The answer to this question clearly appears from the findings made by the auditor in his supplemental report. Those findings were to the effect that all the work had been finished on 13 of the houses as to stages (b), (c) and (d) specified in the schedule of payments, and on the house on the 14th lot as to the stages (b) and (c). This justified the payments advanced by Housing to the extent of $55,900.00. But the next stage of the construction work, namely,

(e) was not completed as to any of the houses, and yet advances were made by Housing in addition to the $55,900.00—even, in some instances, advances that should have been made only when the stages of (f) and (g) had been completed—to the extent of $26,500.00. The auditor found that the schedule had been "substantially" complied with, and therefore that the excess payments were justified, but his very recital in detail of the work remaining uncompleted shows that there was not any such substantial completion of the work as would have warranted the advance payments of the additional $26,500.00. Moreover, by the terms of the construction loan agreements advances were not to be made during the course of the performance of any of the stages of the work, but only upon the *completion* of each stage, and while, as between Allied and Housing, the latter could, at its option, have *voluntarily* advanced moneys as the work progressed without waiting until the termination of that particular stage, it could not do this to the prejudice of Clark's right to insist upon the performance of the construction loan agreements as written and as incorporated in the advance-money mortgages to which he had subordinated the lien of his own mortgage. Nor did the fact that the advances were to be made "only if and when the various stages of work are completed to the satisfaction of" Housing give legal warrant to the latter, as against the rights of Clark, to anticipate payments because of its being "satisfied" that the progress of the work justified such liberality on its part. That provision was solely for the protection of Housing, and did not vest in it any additional latitude, as far as Clark was concerned, to make payments which it was not required to make under the terms of the schedule.

It follows from what has been said, that, of the purchase price paid by Housing at the sheriff's sales, it is

entitled to priority to the extent of the $56,900.00 properly advanced by it, but its advances in excess of that sum must be subordinated to the balance remaining due to Clark under his purchase money mortgage. And in view of the conclusion thus reached, the orders of the court below imposing costs of the proceedings upon Housing must be sustained.

In appeals numbered 16 and 17 March Term, 1953, the orders are affirmed. In appeals numbered 4 and 5 March Term, 1953, the orders are reversed, and the record is remanded that orders may be entered awarding distribution in accordance with this opinion.